**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | **Case No. 2:10-CR-57** |
| **v.** | ) | |
| | ) | **Hon. Raymond A. Jackson** |
| **MAXAMAD CALI SACIID, et al.,** | ) | |
| | ) | |
| **Defendants,** | ) | |

**DEFENDANTS' JOINT REPLY TO THE GOVERNMENT'S
RESPONSE TO THEIR MOTION TO DISMISS COUNT I**

Defendants Maxamad Cali Saciid, Mohammed Abdi Jamah, Jaamac Ciidle, Abdicasiis Cabaase, Abdirasaq Abshir and Mahamed Farraah Hassan, by counsel, hereby respectfully submit this Reply to the government's Response to their Motion to Dismiss Count I.

## INTRODUCTION

Relying primarily on a speech given by then-Congressman John Marshall, a Supreme Court case addressing civil forfeiture, and modern pronouncements by assorted international bodies, the government claims that "piracy in violation of the law of nations" includes any unauthorized violent act on the high seas. Tellingly, the government cites not one example in the history of American jurisprudence of a criminal prosecution for piracy that did not involve the seizure of a ship. It cites to none because there are none.

The issue before the Court is one of pure statutory interpretation, namely, the meaning of the phrase "piracy as defined by the law of nations," as set forth in 18 U.S.C. § 1651. In addressing that issue, this Court is bound by the Supreme Court's interpretation of the statute in *United States v. Smith*, 18 U.S. (5. Wheat.) 153, 161-62 (1820). In *Smith*, the Court held that the phrase "piracy as defined by the law of nations" set forth in § 5 of the 1819 Piracy Act, which is codified today at 18

U.S.C. § 1651, means a robbery at sea.  18 U.S. at 162.  Thus, at the very least, the crime of piracy

requires the seizure of a vessel or robbery therefrom.  The government attempts to avoid *Smith* by

citing authorities that, unlike *Smith*, do not address the statute before the Court.

In fact, the various sources cited by the government reveal nothing as to the meaning of

§ 1651.  For example, whatever *Congressman* John Marshall may have said about piracy in a speech

almost 20 years before § 1651 was enacted, *Chief Justice* John Marshall stated the following in an

October 31, 1819, letter to Justice Bushrod Washington in regards to the trial in the *Smith* case:

> In the trials at Richmond the evidence was perfectly clear & the case was
> unequivocally a case of piracy according to the law of every civilized nation.  *The*
> *doubt I entertain is whether there is any such thing as Piracy as "defined by the law*
> *of nations."*  All nations punish robbery committed on the high seas by vessels not
> commissioned to make captures yet I doubt seriously whether any nation punishes
> otherwise than by force of its own particular statute.

Letter from Chief Justice John Marshall to Justice Bushrod Washington (Oct. 31, 1819), *in* 8 THE

PAPERS OF JOHN MARSHALL 373-74 (Charles F. Hobson, ed., 1995) (emphasis added).  The Supreme

Court, of course, ultimately determined in *Smith* that the phrase "piracy as defined by the law of

nations" as used in § 1651 had a specific meaning: robbery at sea.

Nor should the Court be misled by the government's inexplicable reliance on the Supreme

Court's civil forfeiture jurisprudence construing *section 4* of the 1819 Piracy Act, which authorized

the seizure of any ship that engaged in "piratical aggression."  As explained in *Harmony v. United*

*States*, 43 U.S. (2 How.) 210, 232 (1844),[1] section 4 of the 1819 Piracy Act, the forfeiture provision

of the Act, was much broader than, and did not require proof of, the crime of piracy as defined in

---

[1] The government refers to this case as *The Malek Adhel*.  *See* Response at 10. This case is usually
cited by the last name of the claimant, Harmony, and only occasionally by the name of the ship at
issue in the forfeiture, The Malek Adhel.  *See Bennis v. Michigan*, 516 U.S. 442, 460 n.2 (1996).

*section 5* of the Act. *Id.* (holding that forfeiture provision was not limited to acts of "positive piracy," but included acts merely "hostile in [] character"). In other words, in contrast to the forfeiture provision of the Act, "our statutes do not make *criminally punishable* piratical undertakings or aggressions merely." *The Ambrose Light*, 25 F. 408, 415 (S.D.N.Y. 1885) (emphasis added).

Finally, the Court should reject the government's view that the criminal offense of piracy under § 1651 depends upon definitions proposed by, for example, the International Maritime Bureau, the Privy Council, or a variety of other international instruments. These international sources are inapposite because, to be consistent with the Constitution, criminal laws must be clear, not a moving target. *See United States v. Lanier*, 520 U.S. 259, 266 (1997) ("[T]he touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal."). For starters, no settled modern definition of piracy exists. *See, e.g.*, Helmut Tuerk, *The Resurgence of Piracy: A Phenomenon of Modern Times*, 17 U. Miami Int'l & Comp. L. Rev. 1, 10 (2009) ("Under customary international law, there is no authoritative definition of piracy."). Furthermore, the Supreme Court in *Sosa v. Alvarez-Machain*, 542 U.S. 692, 725 (2004), rejected the view that an 18th Century statute permitting aliens to file suit for torts "in violation of the law of nations" permitted claims "based on the present-day law of nations" far afield from those universally recognized in the 18th Century.

What matters is what the 1819 Congress that enacted the operative language in § 1651 intended to prohibit. *See id.* at 719-20 (construing intent of the First Congress that passed the Alien Tort Act). And the only well-established definition of piracy proscribed by § 1651 is the classic definition described by Justice Story for the Supreme Court in 1820 in *Smith*. Because the

government concedes that the defendants did not commit "robbery upon the sea," as required to allege a violation of § 1651, Count I of the Indictment should be dismissed with prejudice.

## ARGUMENT

**I.    SECTION 1651 CODIFIED THE THEN-EXISTING, CLASSIC DEFINITION OF PIRACY AS "ROBBERY UPON THE SEA."**

*Smith* is controlling on the issue before the Court, *namely*, the interpretation of the phrase "piracy as defined by the law of nations" under § 1651.  In *Smith*, the Court held that when Congress enacted § 1651 (which at the time was section 5 of the 1819 Piracy Act) it codified the then-existing, agreed upon definition of piracy.[2]  18 U.S. at 161-62.  That definition is "robbery at sea," meaning the seizure of a vessel or robbery therefrom.  The government admits that the defendants did not engage in such conduct.  *See* Response 3-4.

Nevertheless, the government characterizes the Court's holding in *Smith* as a non-comprehensive interpretation of the statute, arguing that *Smith* left the door open for other conduct to qualify under the statute as "piracy as defined by the law of nations."  Response at 6.  This argument is flawed in several respects.

---

[2] It is undisputed that the statute the Court interpreted in *Smith* (section 5 of the Piracy Act of 1819) is the same statute at issue in this case (18 U.S.C. § 1651).  A review of the statute's history shows that it has not been substantively changed, except to impose a penalty of life imprisonment instead of death.  *See* An Act to Protect the Commerce of the United States and Punish The Crime of Piracy ("1819 Piracy Act"), ch. 77, sec. 5, 3 Stat 511 (1819) (original act); Act To Continue In Force "An Act To Protect the Commerce of the United States, And Punish the Crime of Piracy," ch. 113, sec. 2, 3 Stat. 600 (1820) (no substantive change); Crimes Arising Within The Maritime And Territorial Jurisdiction of the United States, ch. 3, sec. 5368, 18 Stat 1042, 1047 (1874) (no substantive change); Piracy And Other Offenses Upon The Seas, ch. 321, sec. 290, 35 Stat. 1145 (1909) (no substantive change other than punishment); 18 U.S.C. § 481 (1930) (codification of former Criminal Code section into United States Code without substantive revision to statute); Act of June 25, 1948, ch. c. 645, 62 Stat. 774 (1948) (codification of the former 18 U.S.C. § 481 at 18 U.S.C. § 1651 without substantive revision).  Given that section 5 of the Piracy Act and 18 U.S.C. § 1651 are materially identical, they have the same meaning and are referred to interchangeably.

4

First, the government's view that *Smith* did not foreclose the conduct at issue in this case from falling within the meaning of "piracy as defined by the law of nations" is contrary to a plain reading of the Court's decision.   The premise of *Smith* is that "piracy as defined by the law of nations" under § 1651 proscribes a narrow set of conduct, notwithstanding "whatever may be the diversity of definitions" among the international community. 18 U.S. at 161-62.   That narrow subset, the *Smith* Court determined, consisted of the common, consensus definition of piracy that existed at the time of the statute's enactment, namely, "robbery upon the sea." 18 U.S. at 162.   The Court did not state mere acts of aggression or conduct short of "robbery upon the sea" was encompassed within the concept of "piracy as defined by the law of nations" because its comprehensive review of the law did not support such a conclusion.[3]

The government attempts to obscure the *Smith* Court's ultimate determination by isolating the Court's use of the phrase "forcible depredations" and characterizing it as "general terminology that could cover a variety of offense conduct." Response at 8.   Reading the Court's use of the phrase "forcible depredations" in this manner is contrary to the overall holding of *Smith*, *i.e.*, that at the time § 1651 was passed piracy was universally understood to be robbery at sea.   The government's

---

[3] The history surrounding the enactment of the Piracy Act of 1819 underscores the limited scope of the statute and provides context to the Court's decision in *Smith*.   The Piracy Act of 1819 was enacted in the wake of the Supreme Court's decision in *United States v. Palmer*, 16 U.S. (3 Wheat.) 610 (1818).   In *Palmer*, the Supreme Court held that the offense of piracy under the Piracy Act *of 1790* did not reach foreign vessels. *Id.* at 344-45.   The Court's decision, however, was unpopular and prompted action by Congress.   As one scholar has explained: "[The *Palmer* decision] was not well received.   That it left the law with respect to piracy more restricted than it had been supposed to be was made evident when Congress promptly enacted a new statute, the Act of March 3, 1819, to supply the omission which the Supreme Court had discovered." Edwin D. Dickinson, 38 Harv. L. Rev. 334, 345 (1925).   Thus, in enacting the piracy act of 1819, Congress intended for the offense of piracy to apply without regard to nationality.   There is no indication in this history, however, that Congress intended to expand the scope of the offense to mere acts of aggression.

reading of the phrase "forcible depredations" is also contrary to the plain meaning of the word "depredation."  Black's Law Dictionary defines "depredation" as "the act of plundering, robbing, or pillaging."  BLACK'S LAW DICTIONARY 441 (6th ed. 1991). This definition does not include mere acts of aggression, and that is clearly not how the Court used the phrase "forcible depredations" in *Smith*.

The government's reading of *Smith* also fails because it has not established that (a) mere unauthorized violence on the high seas was universally recognized as piracy in 1819, or (b) that the Fifteenth Congress intended to enact a criminal statute that would evolve as a moving target over time.  "It is the intent of the Congress that enacted [the operative language in the statute] . . . that controls."  *Teamsters v. United States*, 431 U.S. 324, 354, n.39 (1977); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 724 (2004) (construing the meaning of the 1789 Alien Tort Act based on the intent of the First Congress that enacted the statute).[4]  That intent is made clear in *Smith*'s nearly contemporaneous interpretation, Congress's failure to substantively amend the statute since 1819, and its acknowledgment that the statute has remained unchanged despite 20th Century developments in international law.  *See Cottage Sav. Ass'n v. Comm'r*, 499 U.S. 554, 562 (1991).  Thus, the *Smith* Court's interpretation is as valid today as it was when *Smith* was handed down.[5]

---

[4]  The government wrongly asserts that the defendants are arguing this Court cannot rely on authorities that post-date the enactment of the 1819 Piracy Act and *Smith*.  *See* Response 20-21.  Quite the contrary, the Court should rely on *any* source that provides insight on what Congress meant when it enacted the Piracy Act in 1819, particularly binding Supreme Court precedent.

[5]  The government argues that, even if the Court construes § 1651 as codifying the law of piracy at the time of its original enactment, the Court should look to the status of international piracy law at the time of the 1909 or 1948 re-codifications.  Response at 24.  This argument lacks merit because section 5 of the 1819 Piracy Act was never substantively revised.  *See supra* note 2.  Accordingly, it is the intent of the Congress in 1819 that controls the statute's interpretation.  *See Finley v. United States*, 490 U.S. 545, 554 (1989) ("It will not be inferred that Congress, in revising and consolidating

Second, the government's interpretation of § 1651 as encompassing conduct other than "robbery upon the sea" is unreasonable when viewed in context of other piracy-related offenses. Specifically, this interpretation would render § 1651 indistinguishable from the offense of attack to plunder a vessel, which is codified at 18 U.S.C. § 1659.  The offense of attack to plunder a vessel, which has also been charged in this case, states that

> [w]hoever, upon the high seas or other waters within the admiralty and maritime jurisdiction of the United States, by surprise or open force, maliciously attacks or sets upon any vessel belonging to another, with an intent unlawfully to plunder the same, or to despoil any owner thereof of any moneys, goods, or merchandise laden on board thereof, shall be fined under this title or imprisoned not more than ten years, or both.

*Id.*

This Court should not "adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." *Mackey v. Lanier Collection Agency & Service*, *Inc*., 486 U.S. 825, 829 (1988) (citations omitted)).  Likewise, statutes relating to the same subject matter must be construed harmoniously.  *See Digital Equip. Corp. v. Desktop Direct, Inc*., 511 U.S. 863,

---

the laws, intended to change their effect unless such intention is clearly expressed." (internal quotation marks omitted)); *United States v. Price*, 361 U.S. 304, 313 (1960) (holding that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one"); *United States v. Langley*, 62 F.3d 602, 605 (4th Cir. 1995) ("absent a clear manifestation of contrary intent, a newly-enacted or revised statute is presumed to be harmonious with existing law and its judicial construction").

Moreover, in administratively reorganizing Title 18 in 1948, Congress specifically stated it was *not* substantively revising domestic piracy statutes and that its re-codification should not be construed as even addressing – let alone incorporating – modern international legal developments. *See* H.R. REP. NO. 80-304, at A112 (1947) ("[In light of far-reaching developments in the field of international law and foreign relations, the law of piracy is deemed to require a fundamental reconsideration and complete restatement, perhaps resulting in drastic changes by way of modification and expansion.  Such a task may be regarded as beyond the scope of this project. . . . It is recommended, however, that at some opportune time in the near future, the subject of piracy be entirely reconsidered and the law bearing on it modified and restated in accordance with the needs of the times.").

879 (1994) ([C]ourts should construe statutes . . . to foster harmony with other statutory and constitutional law."); *Orquera v. Ashcroft*, 357 F.3d 413, 422 (4th Cir. 2003) ("the general rule is that prior and later statutes dealing with the same subject matter … should as far as reasonably possible be construed in harmony with each other so as to allow both to stand and to give force and effect to each") (citation omitted); *accord United Hospital Center, Inc. v. Richardson*, 757 F.2d 1445, 1451 (4th Cir. 1985). Statutes must also be construed so as to avoid absurd results – which would be the outcome if § 1651, a mandatory life offense, was interpreted as addressing the same conduct as § 1659, an offense allowing a maximum ten-year term of imprisonment. *See United States v. Turkette*, 452 U.S. 576, 580 (1981) (absurd results should be avoided in construing statutes).

Section 1659 was originally enacted in 1825, and was plainly designed to address conduct other than piracy. *See* Act More Effectually to Provide For The Punishment Of Certain Crimes Against The United States, And For Other Purposes, ch. 65, sec. 6, 4 Stat. 115, 116 (1825). Indeed, case law interpreting § 1659 reveals that it encompasses the government's proposed definition of piracy, *i.e.*, a failed attack on another vessel. *See Daeche v. United States*, 250 F. 566, 571 (2d Cir. 1918) (Hand, J.). In *Daeche*, the Second Circuit held that the defendants could be liable for conspiring to commit the offense of attack to plunder a vessel based on evidence that they bought bombs and had a plan to destroy Allied ammunition ships, even though that plan was never successfully carried out. *Id.* at 570-71. The Court's holding in *Daeche* makes clear that the offense of attack to plunder a vessel, 18 U.S.C. § 1659, encompasses mere acts of aggression. The fact that Congress has codified a separate statute punishing attacks on another vessel (and has provided a less

severe sanction for violation of that statute) demonstrates that the government's reading of § 1651 is wrong.  *See Mackey*, 486 U.S. at 829.

The effective obliteration of § 1659 would not be the only absurd result from the government's reading of the statute.  As a practical matter, a wide range of conduct would suddenly be subject to § 1651's harsh punishment of a mandatory term of life imprisonment.  For example, Greenpeace activists that forcibly prevent a whaling ship from carrying out its mission could be considered "pirates" and imprisoned for life.  *See generally* Samuel Menefee, *The Case of Castle John, or Greenbeard the Pirate?: Environmentalism, Piracy, and the Development of International Law*, 24 Cal. W. Int'l L.J. 1 (1993).

Third, the government's reading of § 1651 and *Smith* is not supported by case law.  The government does not cite a single decision of a federal court that holds § 1651 encompasses the conduct at issue in this case.  As discussed in Part II below, the few American judicial opinions the government cites are inapposite because they do not address § 1651.  Moreover, many of the authorities the government cites veer far in time and relevancy from the statute at issue in this case.  For example, the government discusses at length a 1905 international law treatise, a 1934 decision of the British Privy Council, a 1982 United Nations treaty that has not been ratified by the United States, and modern pronouncements by the International Maritime Bureau.  These 20th Century authorities have no bearing on what Congress meant when it enacted the Piracy Act in 1819.  And as the Supreme Court has held, statutes are interpreted as having "the meaning generally accepted in the legal community at the time of enactment."  *Department of Labor v. Greenwich Collieries*, 512 U.S. 267, 275 (1994).

The Supreme Court's holding in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), confirms that this Court's application of § 1651 should be consistent with Congress' understanding of the scope of "piracy as defined by the law of nations" at the time the statute was enacted.  At issue in *Sosa* was scope of the Alien Tort Statute, which provided federal courts with jurisdiction over tort claims brought by aliens, provided the tort was committed in violation of domestic law or "in violation of the law of nations." *Id.* at 698-99.  Like § 1651, the Alien Tort Statute used the phrase "the law of nations" without specifically defining the conduct that fell within the scope of the phrase. *Id.* at 712; *see also* 28 U.S.C.A. § 1350 (codification of statute).  Also like  § 1651, the Alien Tort Statute has been part of domestic law for centuries, as it was enacted in 1789.

The Supreme Court held that the Alien Tort Statute provided jurisdiction to "a relatively modest set of actions" that were of international concern at the time of enactment, such as offenses against ambassadors. *Sosa*, 542 U.S. at 720.  The Court further held that the statute's reference to "the law of nations" would allow for new alien tort claims to be brought only if those claims were as well-established and universally recognized as was, for example, a tort against an ambassador in 1789. *Id.* at 725 ("A series of reasons argue for judicial caution when considering the kinds of individual claims that might implement the jurisdiction conferred by the early statute."); *id.* at 728 ("These reasons argue for great caution in adapting the law of nations to private rights.").  Thus, the holding of *Sosa* was limited and, of course, came in the context of a civil jurisdiction statute.

Moreover, the government has failed to establish that "unauthorized violent acts on the high seas" constitutes a universally agreed upon definition of piracy akin to the definition identified in *Smith*.  It cites to a treaty that has not been ratified by the United States and a select few other international sources.  The reality, however, is that there is no modern consensus on the law of

piracy.  *See* Alfred P. Rubin, THE LAW OF PIRACY 344 (1988) (concluding "there is no public

international law defining 'piracy' and criticizing international efforts to define piracy); Helmut

Tuerk, *The Resurgence of Piracy: A Phenomenon of Modern Times*, 17 U. Miami Int'l & Comp. L.

Rev. 1, 10 (2009) ("Under customary international law, there is no authoritative definition of

piracy."); Michael Bahar*, Attaining Optimal Deterrence At Sea: A Legal And Strategic Theory For

Naval Anti-Piracy Operations*, 40 Vand. J. Transnat'l L. 1, 26-33 (2007) (recognizing disagreement

over what conduct is encompassed in United Nations treaty provisions on piracy).  To the extent the

law of piracy has changed since *Smith*, it has become only more clouded with the emergence of new

international bodies.  The only standard that has remained consistent under United States law is the

*Smith* standard, namely, that piracy is robbery at sea.

## II.   THE GOVERNMENT ERRONEOUSLY RELIES ON A CIVIL FORFEITURE CASE AND OTHER AUTHORITIES THAT DO NOT ADDRESS § 1651.

The government's argument that *Smith* left the door open for conduct short of robbery at sea

to constitute the *criminal* offense of piracy under § 1651 is undermined by the fact that it fails to cite

a single case supporting this interpretation of the statute.  To be sure, the government discusses two

cases at length in support of its reading of § 1651 and *Smith*.  *See* Response at 9-13.  Neither of these

cases, however, involved a criminal prosecution under § 1651.  And they certainly do not hold that

the statute encompasses conduct short of "robbery at sea."

First, the government relies heavily on *Harmony v. United States*, 43 U.S. (2 How.) 210

(1844).[6]  The government cites *Harmony* for the proposition that "the actual taking away of property

by the defendant" is not a "necessary element of the *crime* of piracy under the law of nations."

_____

[6] The government refers to this case as *The Malek Adhel*.  *See supra* note 1.

Response at 10 (emphasis added). The citation of *Harmony* as authority for what constitutes the *crime* of piracy is extraordinary, given that the case did not involve a criminal prosecution and the Court went out of its way to make clear that its reasoning did *not* apply to the criminal offense now codified at § 1651.

In *Harmony*, The Malek Adhel fired on several ships without provocation and stopped several other ships under false pretenses, but did not take control of any of these ships. 43 U.S. at 212-18, 230. Significantly, the government did not bring a criminal case against the ship's captain under section 5 of the Piracy Act of 1819 (which is now codified at 18 U.S.C. § 1651). Instead, the government brought a civil forfeiture action against the ship, claiming that it was subject to being forfeited under *section 4* of the 1819 Act. 43 U.S. at 321. Section 4 of the Act covered far more conduct that the Act's criminal provision (§ 1651), as it stated

> [t]hat whenever any vessel or boat, from which any piratical aggression, search, restraint, depredation, or seizure shall have been first *attempted* or made, shall be captured and brought into any port of the United States, the same shall and may be adjudged and condemned to their use ....

1819 Piracy Act, ch. 77, sec. 4, 3 Stat 511 (1819) (emphasis added).

In contrast to section 4's broad reference to "piratical aggression" and other conduct, section 5 of the 1819 Act was very specific. Section 5 imposed criminal sanction on "any person or persons" who "commit the crime of piracy, as defined by the law of nations." 1819 Piracy Act, ch. 77, sec. 5, 3 Stat 511 (1819). Section 5 did not, and § 1651 does not, proscribe attempts. *See* 18 U.S.C. § 1651 (proscribing commission of the completed act of piracy, but not proscribing attempted piracy); *see also United States v. Anderson*, 89 F.3d 1306, 1314 (6th Cir. 1996) (an attempt to

commit an offense is "[a]ctionable only when a specific federal criminal statute makes it impermissible to attempt to commit the crime").

Although the government glosses over the distinction between section 4 and section 5 in its analysis of the *Harmony*, the differences in these provisions was not lost on the Court.  The ship's owners argued that the ship should not be subject to civil forfeiture under section 4 because the acts of aggression, even "if carried to complete execution, would not amount to positive piracy." 43 U.S. at 232.  The Court rejected this argument on the ground that section 4 used the term "piratical" which – in contrast to section 5 – included mere acts of aggression.  *Id.  Harmony* thus stands for exactly the opposite principle of law that the government asserts.

Other courts have also distinguished the crime of piracy from "piratical undertakings or aggressions merely." *The Ambrose Light*, 25 F. 408, 415 (S.D.N.Y. 1885).  In *The Ambrose Light*, the government filed a civil suit seeking condemnation of a ship that blockaded the Colombian port city of Cartagena.  The District Court refused to condemn the ship because the ship was affiliated with forces that the United States government had recognized as having *de facto* control over Colombia.  *Id.* at 443.  In reaching this decision, the District Court explained the distinction between piratical aggression, which could subject a ship to civil condemnation, and the criminal act of piracy:

> This is a suit *in rem* for the condemnation of the vessel only; not a trial upon a criminal indictment of her officers or crew.  The two proceedings are wholly independent, and pursued in different courts.  Condemnation of the vessel as piratical does not necessarily imply a criminal liability of her officers or crew.  *The vessel might be condemned for being engaged upon a piratical expedition only, or for attempts at piratical aggression or restraint. In such a case no indictment for piracy would lie, because criminal punishment is inflicted only according to the municipal law of the captors; and our statutes do not make criminally punishable piratical undertakings or aggressions merely*.

*Id.* at 415 (emphasis addded).

In addition to *Harmony*, the government relies on *United States v. Tully*, an 1812 Circuit Court decision, to support its interpretation of *Smith*. 28 F. Cas. 226, 229 (C.C.D. Mass. 1812) (No. 16,545). *Tully*, of course, did not interpret the statute at issue in this case because that statute was not enacted until seven years later. Moreover, *Tully*'s general commentary on the concept of piracy cannot override a subsequent Supreme Court decision that directly addresses the precise issue in this case, namely, the meaning of "piracy as defined by the law of nations" under § 1651.

Indeed, the government's reliance on *Tully* and *Harmony* underscores the fact that it has no case applying section 1651 to the conduct at issue in this case. Instead, the government attempts to supplement its argument with citation to definitions of the word "pirate" and "depredate" that are as inapplicable as the civil forfeiture provisions of the Act of 1819. For example, in support of its sweeping assertion that "[a] number of authorities support the definition of piracy under the law of nations as inclusive of private, unauthorized acts of violence on the high seas," the government cites a 19th Century treatise by British jurist William Hawkins as defining a "pirate" as "one who, to enrich himself, either by surprise or open force, sets upon merchants or others trading by sea, to spoil them of their goods or treasure." Response at 5.

Section 1651, however, is not a status offense. It does not punish someone for being a "pirate" as defined by William Hawkins or any other commentator. Instead, it subjects to criminal sanction those who engage in the *act* of "piracy as defined by the law of nations." The authoritative interpretation of that conduct is found in *Smith*. The fact that the government cannot cite a single case applying § 1651 and the penalty of life imprisonment to conduct short of seizing a ship, and the fact that the government has resorted to civil forfeiture cases and 20th century pronouncements by non-governmental international organizations speaks volumes regarding the weakness of its

14

interpretation.  The Court should reject this interpretation and hold it is bound by the Supreme

Court's holding in *Smith*.

### III.   EVEN IF THE GOVERNMENT'S INTERPRETATION OF § 1651 WAS CORRECT, DUE PROCESS WOULD PREVENT THE COURT FROM IMPOSING CRIMINAL PENALTIES BASED ON AN EVOLVING AND UNCERTAIN STANDARD.

The government, in essence, argues that § 1651 is a moving target.  The government asserts

that § 1651 encompasses whatever conduct qualifies as piracy "under the law of nations" at the time

the offense was committed.  *See* Response at 21-22.  The government presents its time-of-the-offense

interpretation of § 1651 as superior to what it characterizes as the defendants' "snapshot approach."

*Id.* at 22.  What matters is not the government's characterization, but the intent of the Congress that

enacted the operative language in § 1651.  And the defendant's interpretation of § 1651 is consistent

with (a) *Smith*, (b) the fact that no Court has ever applied § 1651 to conduct that did not involve the

seizure of a vessel, (c) the need to interpret § 1651 in a manner that does not render § 1659

superfluous, and (d) the fact that Congress has stated in Title 18's legislative history and Revision

Notes that § 1651 has not been updated since 1819 and does not reflect modern definitions of piracy.

*See* Defendant's Joint Motion to Dismiss Count I at 8-9.

The government's moving target interpretation lacks such a firm grounding.  Indeed, under

the government's definition, the conduct proscribed under § 1651 could expand or contract based

on pronouncements by the Privy Council,[7] policy statements issued by the International Maritime

---

[7] The government discusses at length the Privy Council's decision in *In re Piracy Jure Gentium*, [1934] A.C. 586, 586.  Resp. at 14-16.  To the extent it has any relevancy to this case, the Privy Council's 1934 decision demonstrates that – contrary to the government's argument – international law with respect to piracy has *not* been consistent throughout the Nineteenth, Twentieth, and Twenty-First Centuries.  In *In re Piracy Jure Gentium* the Privy Council, after discussing *Smith*, stated that "with all deference to so great an authority, the remark must be applied to Story, J. in 1820 that has already been applied to Sir Charles Hedges in 1696, *which is that international law*

Bureau, or the publication of a treatise by a German law professor.  Moreover, it is entirely unclear

which of these various authorities the Court should look to when determining the meaning of "piracy

as defined by the law of nations" on the day the offense allegedly occurred, April 10, 2010.[8]

      In any event, the government's moving target interpretation requires this Court to engage in

an impossible task, as no consensus currently exists as to the definition of piracy under international

law.  *See* Helmut Tuerk, *The Resurgence of Piracy: A Phenomenon of Modern Times*, 17 U. Miami

Int'l & Comp. L. Rev. 1, 10 (2009) ("Under customary international law, there is no authoritative

definition of piracy."); Carlo Tiribelli, *Time to Update the 1988 Rome Convention for the*

*Suppression of Unlawful Acts Against the Safety of Maritime Navigation*, 8 Or. Rev. Int'l L. 133, 141

(2006) ("a substantive meaning of piracy in contemporary international law is unsettled"); Rubin,

THE LAW OF PIRACY 344 (1988) ("It may be concluded that both in current practice and in current

---

*has not become so a crystalized code at any time, but is a living and expanding branch of law.*"
A.C. at 597 (emphasis added); *see also id.* at 600 ("A careful examination of the subject shows a
gradual widening of the earlier definition of piracy to bring it from time to time more in consonance
with situations either not thought of or not in existence when the older jurisconsults were expressing
their opinions.").  Moreover, the Privy Council made clear that it decidedly was *not* engaging in an
effort to describe a consensus, international view of piracy as the Court did in *Smith*.  Instead, at the
beginning of the opinion the Privy Council made clear that it was identifying the "best" definition
of piracy: "Speaking generally, in embarking upon international law, their Lordships are to a great
extent in the realm of opinion, and in estimating the value of opinion it is permissible not only to
seek a consensus view, *but to select what appear to be the better views upon the question.*"  *Id.* at
589 (emphasis added).  Thus, contrary to the government's argument, *In re Piracy Jure Gentium*
stands for the Privy Council's view of the "best" definition of piracy in 1934 according to the "living
and expanding branch" of international law – not the consensus definition that existed when
Congress enacted the Piracy Act in 1819.

[8] The government's curious citation to the principle drawn from *Murray v. The Charming Betsy*, 6
U.S. (2 Cranch) 64, 118 (1804), has no bearing in this case.  This Court's construction of a criminal
statute can hardly be said to "violate" international law, particularly if that construction is consistent
with an 1820 opinion of the Supreme Court.  In other words, international law does not require states
to enact domestic statutes designed to criminalize particular conduct, and is not violated when states
fail to do so.

theory built upon ancient roots and the evolution of the international political and legal orders, there is no public international law defining 'piracy;' that the only legal definitions of 'piracy' exist in municipal law and are applicable only in municipal tribunals bound to apply that law."); George Smith, *From Cutlass to Cat-O'-Nine Tails: The Case for International Jurisdiction of Mutiny on the High Seas*, 10 Mich. J. Int'l L. 277, 288-89 (1989) ("the adoption of a system of law that encompasses both treaty law and customary international law, without further definition, makes difficult an understanding of what acts constitute the municipal crime of piracy insofar as treaty law and customary international law are inconsistent. The vagueness of the definition of piracy becomes apparent when the sources of international law are substantively considered.").

    Basing a criminal prosecution on the vagaries of this international legal landscape would violate the Due Process Clause. *See United States v. Lanier*, 520 U.S. 259, 266 (1997) ("[T]he touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal."). In other words, the government's argument undercuts the premise of the Supreme Court's holding in *Smith* that section 5 of the Piracy Act was *not* unconstitutionally vague. The *Smith* Court was able to avoid holding that § 1651 was unconstitutionally vague because it determined the statute had a specific meaning, *i.e.*, it proscribed robbery at sea. The government's reading of § 1651 would eliminate that specific meaning and unmoor the statute from the consensus definition identified by Justice Story. Accordingly, this Court should reject the government's interpretation and likewise avoid interpreting § 1651 in a manner that renders it unconstitutionally vague.

**CONCLUSION**

For the reasons set forth above, the defendants respectfully request that this Court grant this

Motion and dismiss Count I.

Respectfully submitted,

MAXAMAD CALI SACIID

MOHAMMED ABDI JAMAH

JAAMAC CIIDLE

ABDICASIIS CABAASE

ABDIRASAQ ABSHIR

MAHAMED FARRAAH HASSAN

By:    _____/s/_____
       Keith Loren Kimball

Keith Loren Kimball
VSB # 31046
Arenda Allen
VSB # 35517
Attorneys for Maxamad Cali Saciid
Office of the Federal Public Defender
150 Boush Street, Suite 403
Norfolk, Virginia 23510
(757) 457-0800
(757) 457-0880 (telefax)
keith_kimball@fd.org
arenda_allen@fd.org

Robert Rigney
VSB # 27537
Attorney for Defendant Mohammed Abdi Jamah
BB & T Building, Suite 1520

500 East Main Street
Norfolk, Virginia 23510
(757) 625-1775
(757) 625-1887 (telefax)
rigney@prlaw.org

Christian Connell
VSB # 35009
Attorney for Defendant Jaamac Ciidle
555 E. Main Street, Suite 1410
Norfolk, Virginia 23510
(757) 533-6500
(757) 533-6565 (telefax)
christian.connell@verizon.net

Bruce Sams
VSB # 21702
Attorney for Defendant Abdicasiis Cabaase
208 Plume Street, Suite 210
Norfolk, Virginia 23510
(757) 627-3999

(757) 627-4042 (telefax)
samsandgilchrist@sag.hrcoxmail.com

Trey Kelleter
VSB # 41606
Attorney for Defendant Abdirasaq Abshir
500 World Trade Center
Norfolk, Virginia 23510
(757) 446-8697
(757) 446-8670 (telefax)
tkelleter@vanblk.com

David Good
Attorney for Defendant Mahamed Farraah Hassan
VSB #
2492 North Landing Road, Suite 104
Virginia Beach, Virginia 23456
(757) 306-1331
(757) 301-3640 (telefax)
dgood@dgoodlaw.com

## CERTIFICATE OF SERVICE

I certify that on this 28th day of June, 2010, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to:

Ben Hatch
Assistant United States Attorney
Office of the United States Attorney
600 East Main Street, Suite 1800
Richmond, Virginia 23219
ben.hatch@usdoj.gov

and

Joseph DePadilla
Assistant United States Attorney
Office of the United States Attorney
101 W. Main Street, Suite 8000
Norfolk, Virginia 23510
joe.depadilla@usdoj.gov


_____/s/_____
Keith Loren Kimball
VSB # 31046
Attorney for Defendant Maxamad Saciid
Office of the Federal Public Defender
150 Boush Street, Suite 403
Norfolk, Virginia 23510
(757) 457-0800
(757) 457-0880 (telefax)
keith_kimball@fd.org